# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 16-1712V
### Filed: August 21, 2019
UNPUBLISHED

| | |
|---|---|
| ALCEO LUCARELLI,<br><br>                  Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                  Respondent. | Special Processing Unit (SPU);<br>Damages; Causation-In-Fact;<br>Influenza (Flu) Vaccine; Shoulder<br>Injury Related to Vaccine<br>Administration (SIRVA) |

*Ronald Craig Homer, Conway, Homer, P.C., Boston, MA, for petitioner.*
*Voris Edward Johnson, U.S. Department of Justice, Washington, DC, for respondent.*

### DECISION AWARDING DAMAGES[1]

**Dorsey**, Chief Special Master:

On December 29, 2016, Alceo Lucarelli ("Mr. Lucarelli" or "petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*,[2] (the "Vaccine Act"), alleging that, as a result of receiving an influenza ("flu") vaccination on October 20, 2014, he suffered a shoulder injury related to vaccine administration ("SIRVA"). *See* Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters. On February 4, 2019, a Ruling on Entitlement was issued, finding petitioner was entitled to compensation for a left shoulder SIRVA that also manifested as right shoulder pain. For the reasons discussed below, the undersigned now awards compensation in the amount of

---

[1] The undersigned intends to post this decision on the United States Court of Federal Claims' website. **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access. Because this unpublished decision contains a reasoned explanation for the action in this case, undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

**$80,000.00 for past pain and suffering, and $380.54 for past unreimbursable medical expenses**.

## I.    Procedural History

On January 4, 2017, petitioner filed medical records, affidavits, and a Statement of Completion.  ECF Nos. 6-9; 12.  After conducting a review of the records, on June 16, 2017, respondent filed a status report stating that he was willing to engage in settlement negotiations and inviting petitioner to forward a settlement demand.  ECF No. 21.

On December 18, 2017, petitioner filed a status report indicating that, in response to his demand, "[r]espondent provided a counteroffer . . . indicating that petitioner's pre-existing problems likely explain his current symptoms."  ECF No. 36. Accordingly, petitioner requested the opportunity to supplement the record with an expert report to clarify the symptoms related to petitioner's alleged injury.  *Id*.

On February 2, 2018, petitioner filed an expert report and accompanying exhibits. ECF No. 38.  On May 4, 2018, petitioner filed a status report indicating that, despite engaging in settlement discussions following the submission of petitioner's expert report, the parties' valuation of petitioner's claim remained disparate and requested guidance from the Court.  ECF No. 41.  A Rule 5 status conference was held on June 19, 2018, during which the undersigned tentatively found that petitioner met his burden of proving causation-in-fact under *Althen v. Sec'y Health & Human Servs.*, 418 F.3d 1274 (Fed. Cir. 2005).  ECF No. 44.

On August 7, 2018, petitioner filed a motion requesting a ruling on the record finding that he is entitled to compensation.  ECF No. 45.  Respondent filed a response on August 21, 2018, joining petitioner's request for a ruling on the record and electing not to submit additional evidence on the issue of entitlement.  *Id*.

On February 4, 2019, the undersigned issued a ruling on entitlement finding petitioner entitled to compensation for a left shoulder SIRVA caused-in-fact by a flu vaccination, and that the pain and reduced range of motion progressed and extended into his right shoulder.  ECF No. 47.  The parties then began the process of negotiating the appropriate amount of damages.

Petitioner filed a status report on February 27, 2019, stating that the parties' valuation of petitioner's claim remains disparate, and proposed a briefing scheduling to address damages.  ECF No. 49.  On March 20, 2019, petitioner filed Petitioner's Memorandum in Support of Damages and Motion for Ruling on Damages ("Pet. Br."). ECF No. 54.  Respondent filed Respondent's Memorandum on Damages ("Resp. Br.") on April 15, 2019.  ECF No. 55.

This case is now ripe for a determination regarding petitioner's award of damages.

## II.   Factual History

### A.  Medical Records

Mr. Lucarelli was born on July 22, 1942.  Petition at 2; Ex. 1 at 2.  In his affidavit, Mr. Lucarelli stated that he lives on 5 acres of land, half of which requires tending.  Ex. 21 at 1.  Specifically, he stated that prior to October 2014 his activities in and around his home included planting trees, installing fencing, repairing stone walls, and home renovations such as remodeling of his master bathroom.  *Id*.

On October 20, 2014, petitioner received a flu vaccination in his left deltoid.  Ex. 1 at 2.  Petitioner's pre-vaccination medical history includes restless leg syndrome, sleep apnea, arthritis, and chest pain, but no history of shoulder problems.  *See generally* Ex. 9.[3]  Petitioner's medical records also show he required numerous treatments to relieve pain stemming from osteoarthritis in his knees.  Ex. 2 at 6-13 (showing a series of six injections of Orthovisc®, a sterile mixture used to relieve knee pain in patients with osteoarthritis, between July 2, 2012 and June 17, 2013).

In his affidavit, petitioner stated that the administration of the vaccination was very painful and that, within days, the pain intensified.  Ex. 21 at 2.  He further stated the pain started at the injection site on his left deltoid and radiated down his left arm.  *Id*.  In December of 2014, petitioner contacted his primary care physician, Dr. Paul Bellofiore.  *Id*.  According to petitioner, Dr. Bellofiore suggested over the counter pain reliever Aleve for one week.  *Id.*

On January 12, 2015, Mr. Lucarelli filed a Vaccine Adverse Event Reporting System ("VAERS") report.  The report describes the adverse event as "difficulty raising left arm since the vaccination" and "pain at injection site" beginning on October 21, 2014.  Ex. 17 at 1.

On January 14, 2015, Mr. Lucarelli consulted with neurologist Dr. Peter Greco.  Ex. 11 at 11.  During this visit Mr. Lucarelli reported that, after receiving a flu vaccination on October 20, 2014, he developed pain and discomfort in his left arm.  *Id*.  An x-ray showed "small olecranon bone spur with adjacent soft tissue swelling suggesting bursitis."  *Id*. at 10.  Dr. Greco noted that petitioner was treating with Aleve "with mild relief."  Petitioner also reported difficulty sleeping because of the pain.  *Id*. at 11-12.  No definitive weakness was noted, and physical therapy was suggested at that time.  *Id*. at 11-12.  An electromyography ("EMG") and nerve conduction study was also performed,

---

[3] On September 9, 2014, petitioner was also assessed as obese, weighing 240 pounds at that time with a body mass index of 36.41.  Ex. 9 at 5.

which showed evidence of left carpal tunnel syndrome but was otherwise normal.  Ex. 9 at 89.

Mr. Lucarelli underwent magnetic resonance imaging ("MRI") of his left shoulder and his cervical spine on January 16, 2015.  Ex. 11 at 2, 8-9.  The MRI of petitioner's left shoulder showed no full thickness rotator cuff tear; tendinosis in his bicep, supraspinatus, and infraspinous tendons; mild fluid/edema within the subacromial subdeltoid bursa; and "moderate-to-advanced acromioclavicular joint arthrosis with marginal osteophyte formation and capsular hypertrophy."  *Id*. at 2.  The MRI of petitioner's cervical spine showed "multilevel and multifactorial central canal and foraminal stenosis, most notably centrally and toward the left at the C6-C7 level with underlying cord compression."  *Id*. at 9.

On January 23, 2015, Mr. Lucarelli attended a follow-up appointment with Dr. Greco.  Ex. 11 at 13.  The medical record states that petitioner "still has the left shoulder pain [and] does note some right shoulder pain."  *Id*.  Petitioner continued to report difficulty sleeping.  *Id*.  Petitioner was advised to attend physical therapy and asked to take strict precautions "especially in view of cervical MRI findings."  *Id*. at 14.

On January 29, 2015, Mr. Lucarelli had his initial physical therapy evaluation.  Ex. 15 at 20.  The evaluation indicated that petitioner had a flu shot in October in his left arm and "the next day the left arm started to get sore in the left elbow and wrist and then eventually the pain started to move into the right[.]"  *Id*.  Mr. Lucarelli rated his pain at 8 out of 10.  *Id*.  The initial evaluation stated his prior level of function as "independent with [activities of daily living] take care of the house, walk, lift" and his current deficits as "can't sleep on right side, can't reach over shoulder height without pain in both [upper extremities]…."  *Id.*

Mr. Lucarelli presented to Dr. David Cohen, an orthopedic specialist, on February 9, 2015.  Ex. 2 at 1-2.  Petitioner reported that he experienced left shoulder pain immediately after his October 20, 2014 vaccination, and described it as "dull, achy, and throbbing in quality, moderate in intensity, and constant in duration".  *Id*. at 1.  Petitioner also noted pain that moved toward his right shoulder as well as increased pain in his elbows and knees.  *Id*.  Dr. Cohen noted that petitioner "feels that this all began as a result of the flu shot and these migrating arthralgias have been a result of this."  *Id*.  An exam showed tenderness in petitioner's left shoulder and bicep, mild right cuff tenderness, with impingement of both shoulders.  *Id*.  However, petitioner showed full range of motion and full strength in both shoulders.  *Id*.  Dr. Cohen assessed Mr. Lucarelli with impingement syndrome.  *Id*.  Dr. Cohen also stated that they discussed the "option of corticosteroid injection in the shoulder which we will hold off on for now but may consider" later.  *Id*. at 1-2.

On March 3, 2015, Mr. Lucarelli presented to Dr. Stephen Moses for a rheumatology consultation.  Ex. 12 at 6.  Dr. Moses noted that petitioner "is complaining

4

of generalized arthralgias that began in his left shoulder soon after receiving a flu shot in October 2014…."  *Id*.  A physical exam showed slightly tender left elbow, and shoulders with good range of motion.  *Id*. Dr. Moses stated that "rheumatoid arthritis remains a possibility" and "he was "concerned about the IgM lambda protein and feel [petitioner] should be evaluated by a hematologist for this as well."  *Id*. at 6.

Petitioner attended 8 physical therapy sessions from January 29, 2015 through March 5, 2015.  Petitioner periodically reported various ailments and locations of pain, including his knees and his joints in general.  *See, e.g.*, Ex. 15 at 27 (noting that petitioner reported "I was really sore while I was away.  Started to get pain in both knees as well as the pain I have in shoulders elbow and wrist."); Ex. 15 at 39 (reported "[l]ast night had a bad night where had sharp pains on the right shoulder elbow and knee and 2 alive [sic] did not help and left shoulder still has the continued dull pain").  The physical therapy records do not consistently indicate petitioner's pain levels.  However, when pain levels were reported they often did not specifically state the location.  For example, on February 18, 2015 petitioner reported that he was "sore in all my joints that are constant at about 5/10 but sometimes I get sharp pain in the joints that are a 10/10".  *Id*. at 33.  On February 26, 2015, petitioner reported sharp pains in his right shoulder, elbow, and knee, and continued dull pain in his left shoulder.  *Id*. at 39.  Petitioner again complained of pain on March 2, 2015, categorizing it as "serious pain" in his fingers, thumb, elbows, and shoulder.  *Id*. at 42.  On March 5, petitioner again complained of "pain in all the joints" of 6/10 but that his range of motion improved.  *Id*. at 45.  According to the discharge record, "[p]atient had increased [range of motion] in B[oth] shoulder[s] but therapy was unable to decrease pain in all of his Jts [joints]."  *Id*.

Petitioner had a hematology and oncology consultation with Dr. Kevin Jain on April 6, 2015.  Ex. 13 at 10-11.  Petitioner reported that, subsequent to his October flu vaccination, he developed left shoulder pain that migrated to his right shoulder.  *Id*. at 10.  Dr. Jain noted that petitioner "then had subsequent elbow pain, joint pain, and bony pain. He reports that he did have physical therapy, but his pain has been relentless."  *Id*.

Petitioner had a follow-up with Dr. Moses on May 7, 2015.  Dr. Moses noted petitioner's left acromioclavicular joint was tender, and assessed him with probable epicondylitis in his left elbow, and left rotator cuff tendinitis.  Ex. 12 at 5.  Aleve and ice were recommended.  *Id.*

Petitioner filed a second VAERS report on October 5, 2015.  Ex. 17 at 3.  This report states that "after vaccination, the patient developed pain in shoulders across back and down both arms radiating to hands and also had muscle deterioration and bone issues."  *Id*. at 4.

On March 1, 2016, petitioner was seen by Dr. Peter Levinson.  Ex. 18.  Petitioner reported a history of pain after receiving the flu shot in his left arm that could last hours.  *Id.* at 1-3.  The pain was "very frequent at first, now much less frequent".  *Id.*  Dr. Levinson noted that Mr. Lucarelli had a prolonged problem with pain and discomfort "in the area [of the flu shot] and has had an extensive investigation[.]  There is no obvious etiology but likely it is less frequent and not as severe.  It is possible that it is a neuralgic pain possibly from nerve irritation[.]"  *Id.*  No therapy was discussed or recommended at that time.  *Id.* at 3.  Petitioner presented to Dr. Levinson again on August 18, 2016.  Ex. 23 at 4.  During this appointment he noted that the pain was less frequent and "may occur once a month."  *Id.*  No therapy was discussed or recommended at that time.  *Id.*

Petitioner saw Dr. Cohen for right shoulder pain on September 1, 2017.  Ex. 26 at 3.  Petitioner reported his pain level was 10/10, and that he awoke the day before unable to raise his right arm.  *Id.*  Petitioner was diagnosed with a rotator cuff tear "which has been exacerbated by some acute bursitis."  *Id.*  Physical therapy was ordered, and Dr. Cohen stated "[w]e will consider a shot if it is not getting better over the next 3-6 weeks."  *Id.*

On June 4, 2018, petitioner again saw Dr. Cohen, and reported pain (3 out of 10) in both shoulders.  *Id.* at 1.  Petitioner reported the pain bothers him "when he sleeps on them or puts weight on the elbow."  Ex. 26 at 1.  However, petitioner also stated that there was no numbness or tingling, and the pain did not wake him from sleep.  *Id.*  Petitioner was assessed with impingement syndrome of the right shoulder.  *Id.*  Physical therapy was again recommended, but no follow-up plan was described.  *Id.* at 2.

Between June 13, 2018 and July 10, 2018, Mr. Lucarelli attended 8 sessions of physical therapy.  Ex. 27 at 1-21.  Petitioner's physical therapy evaluation on June 13, 2018, noted ongoing bilateral shoulder pain in his right shoulder more than his left for several years, and that recent x-ray showed arthritic conditions.  *Id.* at 23-24.  Petitioner also reported that his right shoulder pain "can go up to 7/10".  *Id.* at 23.  An evaluation at that time showed reduced range of motion in both shoulders (right more so then left) and moderate reduced strength (4 of 4+ out of 5).  *Id.* at 23.  Petitioner also reported that his right shoulder recently became more painful, with increased difficulty reaching overhead, reaching to the side, lifting, and sleeping.  *Id.*  Additionally, a self-evaluation records certain tasks as severely difficult (heavy household chores, washing his back), and others moderately difficult (carry a shopping bag).  *Id.* at 19.  The physical therapy record from June 13 also indicate petitioner's injury was interfered with his normal social activities "quite a bit".  *Id.* Petitioner reported he was retired and took Aleve if needed for pain.  *Id.* at 23.  On July 10, 2018, petitioner reported sleeping on his shoulder still caused pain, but his movement was improving.  *Id.* at 1.[4]

---

[4] The daily physical therapy notes do not include a description of petitioner's pain or subjective pain levels.

### B.  Petitioner's Expert Report

In addition to medical records, Mr. Lucarelli submitted an expert report of Dr. Marko Bodor.  Ex. 24.  In his expert report, Dr. Bodor stated that the flu vaccination administered on October 20, 2014 likely went into petitioner's subdeltoid bursa and rotator cuff, causing inflammation in the rotator cuff and bursa that likely resulted in shoulder impingement, as noted by one of petitioner's treating physicians, Dr. Cohen. *Id*. at 2.

Additionally, Dr. Bodor provided an explanation regarding how multilevel spondylosis and stenosis in petitioner's cervical spine complicated petitioner's injury, and manifested additional symptoms in his right shoulder.  *Id*.  at 3.

### C.  Impact on Personal Life

Petitioner submitted an affidavit on December 27, 2016.  Ex. 21.  At that time, petitioner reported that he continued to have left shoulder pain with everyday activities, including driving, reaching for objects, and carrying groceries.  *Id.* at 3.  Petitioner also reported that he has been unable to return to the physical activity level he enjoyed prior to his vaccination.

### III.    Party Contentions

Petitioner argues that he should be awarded $100,000.00 for pain and suffering.  Pet. Brief at 18.  Petitioner asserts that his course of treatment has been lengthy, comprising over four years of treatment, 24 physical therapy sessions, an MRI of his left shoulder and cervical spine, an EMG/NCS study, and three orthopedic specialist appointments.  *Id.* at 13-14.  Petitioner emphasizes that his injury caused pain and difficulty with mobility that impacted his family and physically-active lifestyle.  *Id.* at 14-15.  Petitioner alleges that his injury forced him to reduce his travel, stop hiking and foraging for mushrooms, and resulted in his inability to maintain his property at the same level as he did prior to his injury.[5]  Petitioner also notes that his case is unique because his physical symptoms extended beyond his left shoulder, manifesting in his right shoulder due to his specific physiology.  *Id.* at 15-16.

 Petitioner compares the instant case to 8 prior cases in which damages were decided by the undersigned.  *Id.* at 17-18.  Specifically, petitioner cites: *Dhanoa v. Sec'y Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) (awarding $94,900.99 for pain and suffering), *Cooper v. Sec'y Health & Human Servs.*, No. 16-1387, 2018 WL 6288181 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 to a petitioner who experienced eight months of severe or significant pain, and over two years ongoing difficulties), and *Young v. Sec'y Health & Human Servs.*,

---

[5] Petitioner's counsel failed to provide citations to the record for support of these points.

No. 15-1241, 2019 WL 396981 (Fed. Cl. Spec. Mstr. Jan. 4, 2019) (awarding $100,000 in pain and suffering to a petitioner whose severe symptoms lasted approximately six months and a course of treatment that included 50 sessions of physical therapy). *Id*.

Respondent argues that petitioner should be awarded $40,000.00 in compensation for pain and suffering. Resp. Br. at 5. Respondent asserts that petitioner's SIRVA was not very severe, and his age and pre-existing health issues contributed significantly to his claims of pain and suffering. Resp. Brief at 5. Respondent further notes that petitioner did not seek treatment for several months prior to his vaccination, and that his course of treatment was very conservative, consisting of taking Aleve, and attending two rounds of physical therapy over multiple years with no invasive procedures. *Id.* at 6-7.

Respondent argues that *Dhanoa*, *Cooper*, and *Young* are distinguishable as they involved injuries of greater severity and/or duration and provided more evidence that the SIRVAs negatively impacted the respective petitioner's ability to participate in activities they regularly enjoyed. *Id.* at 9. Respondent also asserts that *Knauss v. Sec'y Health & Human Servs.*is instructive here. No. 16-1372V, 2018 WL 3432906 at *7 (Fed. Cl. Spec. Mstr. May 23, 2018). In that case, petitioner was awarded $60,000 for pain and suffering following a SIRVA wherein petitioner sought treatment three months after a vaccination, underwent 15 physical therapy sessions, received a steroid injection, and ultimately reported a 94% recovery with a pain level at 1.5. *Id.* at 2-4.

Petitioner also requests reimbursement of $1,901.80 in past medical expenses including mileage for his travel to and from medical visits, payment for medical treatment, $ 86.70 for over-the-counter medications (Aleve), and $1,434.56 for snow removal. Pet. Br. at 11-12. Petitioner does not have documentation for many of these expenses, as he asserts he paid for them in cash. *Id.* at 12 n.4. Petitioner also argues he will incur $1,200.00 in future unreimbursed expenses related to his SIRVA, specifically a "needle tenotomy or platelet-rich plasma injection" suggested by Dr. Bodor, petitioner's expert. *Id.* at 13. Respondent argues petitioner has not provided substantiating documentation for the alleged payments for Aleve and snow removal, and therefore petitioner is only entitled to $380.54 for past mileage and copay expenses. Resp. Br. at 10. Respondent also objects to petitioner's claim of future medical expenses as merely speculative, and therefore are not compensable. *Id.* at 10.

## IV.    Discussion

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4). Additionally, petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined

to be reasonably necessary." § 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y Health & Human Servs.*, No. 93-92V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Medical records are the most reliable evidence regarding a petitioner's medical condition and the effect it has on his daily life. *Shapiro v. Sec'y Health & Human Servs.*, 101 Fed. Cl. 532, 537-38 (2011) ("[t]here is little doubt that the decisional law in the vaccine area favors medical records created contemporaneously with the events they describe over subsequent recollections.").

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y Health & Human Servs.,* No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y Health & Human Servs.*, No. 93-172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[6] *I.D.*, 2013 WL 2448125, at *9; *McAllister v. Sec'y Health & Human Servs.*, No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), vacated and remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995). Further, when an amount is awarded for "projected"—i.e., future—"pain and suffering," such amount must be adjusted to its "net present value." *Childers v. Sec'y Health & Human Servs.*, No. 96-194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mst. Mar. 5, 1999) (citing Youngblood v. Sec'y Health & Human Servs., 32 F.3d 552 (Fed.Cir.1994)).

The undersigned may also look to prior pain and suffering awards to aid in her resolution of the appropriate amount of compensation for pain and suffering. *Jane Doe 34 v. Sec'y Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, the undersigned also may rely on her own experience adjudicating similar claims.[7] *Hodges v. Sec'y Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *Graves v. Sec'y Health & Human*

---

[6] In this case, awareness of the injury is not in dispute. The record reflects that at all relevant times petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, the undersigned's analysis will focus principally on the severity and duration of petitioner's injury.

[7] From July 2014 until September 2015 the SPU was overseen by former Chief Special Master Vowell. Since that time, all SPU cases, which include the majority of SIRVA claims, have remained on the undersigned's docket.

*Servs.*, 109 Fed. Cl. 579 (2013).  Instead, it is assessed by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program.  *Id*. at 595.

## A. History of SIRVA Settlement and Proffer[8]

SIRVA cases have an extensive history of informal resolution within the SPU.  As of July 1, 2019, 1,187 SIRVA cases have informally resolved[9] within the Special Processing Unit since its inception in July of 2014.  Of those cases, 706 resolved via the government's proffer on award of compensation, following a prior ruling that petitioner is entitled to compensation.[10]  Additionally, 462 SPU SIRVA cases resolved via stipulated agreement of the parties without a prior ruling on entitlement.

Among the SPU SIRVA cases resolved via government proffer, awards have typically ranged from $75,325.00 to $123,116.00.[11]  The median award is $95,470.95. Formerly, these awards were presented by the parties as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering. Since late 2017, the government's proffer has included subtotals for each type of compensation awarded.

Among SPU SIRVA cases resolved via stipulation, awards have typically ranged from $50,000.00 to $95,000.00.[12]  The median award is $70,000.00.  In most instances, the parties continue to present the stipulated award as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering. Unlike the proffered awards, which purportedly represent full compensation for all of

---

[8] Prior decisions awarding damages, including those resolved by settlement or proffer, are made public and can be searched on the U.S. Court of Federal Claims website by keyword and/or by special master. On the court's main page, click on "Opinions/Orders" to access the database. All figures included in this order are derived from a review of the decisions awarding damages within the SPU.  All decisions reviewed are, or will be, available publicly.  All figures and calculations cited are approximate.

[9] Additionally, 36 claims alleging SIRVA have been dismissed within the SPU.

[10] Additionally, there have been 19 prior cases in which petitioner was found to be entitled to compensation, but where damages were resolved via a stipulated agreement by the parties rather than government proffer.

[11] Typical range refers to cases between the first and third quartiles.  Additional outlier awards also exist. The full range of awards spans from $25,000.00 to $1,845,047.00.  Among the 19 SPU SIRVA cases resolved via stipulation following a finding of entitlement, awards range from $45,000.00 to $1,500,000.00 with a median award of $115,772.83. For these awards, the first and third quartiles range from $90,000.00 to $160,502.39.

[12] Typical range refers to cases within the second and third quartiles.  Additional outlier awards also exist. The full range of awards spans from $5,000.00 to $509,552.31.  Additionally, two stipulated awards were limited to annuities, the exact amounts of which were not determined at the time of judgment.

petitioner's damages, stipulated awards also typically represent some degree of litigative risk negotiated by the parties.

## B. Prior Decisions Addressing SIRVA Damages

In addition to the extensive history of informal resolution, the undersigned has also issued 19 reasoned decisions as of the end of May of 2019 addressing the appropriate amount of compensation in prior SIRVA cases within the SPU.[13]

### i.    Below-median awards limited to past pain and suffering

In eleven prior SPU cases, the undersigned has awarded compensation for pain and suffering limited to compensation for actual or past pain and suffering that has fallen below the amount of the median proffer discussed above.  These awards ranged from $60,000.00 to $91,163.89.[14]  These cases have all included injuries with a "good" prognosis, albeit in some instances with some residual pain.  All of these cases had only mild to moderate limitations in range of motion and MRI imaging likewise showed only evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. The duration of injury ranged from six to 29 months and, on average, these petitioners experienced approximately 14 months of pain.

---

[13] An additional case, *Young v. Sec'y of Health & Human Servs.*, No. 15-1241V, cited by petitioner, was removed from the SPU due to the protracted nature of the damages phase of that case.  In that case the undersigned awarded $100,000.00 in compensation for past pain and suffering and $2,293.15 for past unreimbursable expenses. *Young,* 2019 WL 664495 (Fed. Cl. Spec. Mstr. Jan. 22, 2019).  A separate reasoned ruling addressed the amount awarded.  *Young,* 2019 WL 396981 (Fed. Cl. Spec. Mstr. Jan. 4, 2019).

[14] These cases are: *Bruegging*, 2019 WL 2620957 (awarding $90,000.00 for actual pain and suffering and $1,163.89 for actual unreimbursable expenses); *Pruett v. Sec'y of Health & Human Servs.*, No. 17-0561V, 2019 WL 3297083 (Fed. Cl. Spec. Mstr. Apr. 30, 2019) (awarding $75,000.00 for actual pain and suffering and $944.63 for actual unreimbursable expenses); *Bordelon v. Sec'y of Health & Human Servs.*, No. 17-1892V, 2019 WL 2385896 (Fed. Cl. Spec. Mstr. Apr. 24, 2019) (awarding $75,000.00 for actual pain and suffering); *Weber v. Sec'y of Health & Human Servs.*, No. 17-0399V, 2019 WL 2521540 (Fed. Cl. Spec. Mstr. Apr. 9, 2019) (awarding $85,000.00 for actual pain and suffering and $1,027.83 for actual unreimbursable expenses); *Garrett v. Sec'y of Health & Human Servs.*, No. 18-0490V, 2019 WL 2462953 (Fed. Cl. Spec. Mstr. Apr. 8, 2019) (awarding $70,000.00 for actual pain and suffering); *Attig v. Sec'y of Health & Human Servs.,* No. 17-1029V, 2019 WL 1749405 (Fed. Cl. Spec. Mstr. Feb. 19, 2019) (awarding $75,000.00 for pain and suffering and $1,386.97 in unreimbursable medical expenses); *Dirksen v. Sec'y of Health & Human Servs.*, No. 16-1461V, 2018 WL 6293201 (Fed. Cl. Spec. Mstr. Oct. 18, 2018) (awarding $85,000.00 for pain and suffering and $1,784.56 in unreimbursable medical expenses); *Kim,* 2018 WL 3991022 (awarding $75,000.00 for pain and suffering and $520.00 in unreimbursable medical expenses); *Knauss*, 2018 WL 3432906 (awarding $60,000.00 for pain and suffering and $170.00 in unreimbursable medical expenses); *Marino,* 2018 WL 2224736 (awarding $75,000.00 for pain and suffering and $88.88 in unreimbursable medical expenses); *Desrosiers,* 2017 WL 5507804 (awarding $85,000.00 for pain and suffering and $336.20 in past unreimbursable medical expenses).

Significant pain was reported in these cases for up to eight months.  However, in approximately half of the cases, these petitioners subjectively rated their pain as six or below on a ten-point scale.  Petitioners who reported pain in the upper end of the ten-point scale generally suffered pain at this level for three months or less.  Approximately one-half were administered one to two cortisone injections.  Most of these petitioners pursued physical therapy for two months or less and none had any surgery.  The petitioners in *Weber* and *Garrett* attended PT for five and four months respectively, but most of the PT in *Weber* was focused on conditions unrelated to his SIRVA.  Several of these cases (*Knauss*, *Marino*, *Kim*, and *Dirksen*) included a delay in seeking treatment.  These delays ranged from about 42 days in *Kim* to over six months in *Marino*.

## ii.    Above-median awards limited to past pain and suffering

Additionally, in five prior SPU cases, the undersigned has awarded compensation limited to past pain and suffering falling above the median proffered SIRVA award.  These awards have ranged from $110,000.00 to $160,000.00.[15]  Like those in the preceding group, prognosis was "good."  However, as compared to those petitioners receiving a below-median award, these cases were characterized either by a longer duration of injury or by the need for surgical repair.  Four out of five underwent some form of shoulder surgery while the fifth (*Cooper*) experienced two full years of pain and suffering, eight months of which were considered significant, while seeking extended conservative treatment.  On the whole, MRI imaging in these cases also showed more significant findings.  In four out of five cases, MRI imaging showed possible evidence of partial tearing.[16]  No MRI study was performed in the *Cooper* case.

---

[15] These cases are: *Reed v. Sec'y of Health & Human Servs.*, No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019) (awarding $160,000.00 for pain and suffering and $4,931.06 in unreimbursable medical expenses); *Knudson v. Sec'y of Health & Human Servs.*, No. 17-1004V, 2018 WL 6293381 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $305.07 in unreimbursable medical expenses); *Cooper*, 2018 WL 6288181 (awarding $110,000.00 for pain and suffering and $3,642.33 in unreimbursable medical expenses); *Dobbins v. Sec'y of Health & Human Servs.*, No. 16-0854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018) (awarding $125,000.00 for pain and suffering and $3,143.80 in unreimbursable medical expenses); *Collado v. Sec'y of Health & Human Servs.*, No. 17-0225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018) (awarding $120,000.00 for pain and suffering and $772.53 in unreimbursable medical expenses).

[16] In *Reed*, MRI showed edema in the infraspinatus tendon of the right shoulder with a possible tendon tear and a small bone bruise of the posterior humeral head.  In *Dobbins*, MRI showed a full-thickness partial tear of the supraspinatus tendon extending to the bursal surface, bursal surface fraying and partial thickness tear of the tendon, tear of the posterior aspects of the inferior glenohumeral ligament, and moderate sized joint effusion with synovitis and possible small loose bodies.  In *Collado*, MRI showed a partial bursal surface tear of the infraspinatus and of the supraspinatus. In *Knudson*, MRI showed mild longitudinally oriented partial-thickness tear of the infraspinatus tendon, mild supraspinatus and infraspinatus tendinopathy, small subcortical cysts and mild subcortical bone marrow edema over the posterior-superior-lateral aspect of the humeral head adjacent to the infraspinatus tendon insertion site, and minimal subacromial-subdeltoid bursitis.

During treatment, each of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and all experienced moderate to severe limitations in range of motion.  Moreover, these petitioners tended to seek treatment of their injuries more immediately.  Time to first treatment ranged from five days to 43 days.  Duration of physical therapy ranged from one to 24 months and three out of the five had cortisone injections.

### C.  Severity and Duration of Petitioner's SIRVA

The undersigned finds that petitioner experienced a mild to moderate SIRVA and only sought relatively infrequent conservative treatment, however he experienced pain in both his shoulders for an extensive period.

Petitioner was administered the flu vaccine on October 20, 2014.  Ex. 1 at 2.  Petitioner explained that the administration of the vaccine was very painful, and within days it intensified.  Ex. 21 at 2.  Petitioner first sought treatment for the pain on January 14, 2015.  Ex. 11 at 11.  Thereafter, petitioner reported pain for approximately four years, first primarily in his left shoulder but later in both shoulders.  Petitioner's pain was first reported as severe, for example in January of 2015 he reported pain at an 8 out of 10 during physical therapy.  Ex. 15 at 10.  Petitioner also reported his pain as "constant" on February 9, 2015.  Ex. 2 at 1.  Thereafter, his pain improved.  In March of 2016 petitioner reported shoulder pain that was "very frequent at first, now much less frequent".  Ex. 18 at 1-3.  On August 18, 2016, petitioner reported his pain was less frequent and "may occur once a month."  Ex. 26 at 3.  However, while improved, petitioner's complaints of pain continued until at least July of 2018.  For example, on June 13, 2018, petitioner reported bilateral shoulder pain that could go as high as 7/10 at least in his right shoulder.  Ex. 27 at 23.  Further, petitioner repeatedly stated that sleeping on his shoulder still caused pain.  See Ex. 11 at 13 (reporting difficulty sleeping due to pain on January 23, 2015); Ex. 27 at 1 (reporting difficulty sleeping due to pain on July 10, 2018).

The testing and evaluations indicate that petitioner's injury was not as severe as other SIRVAs seen in this program.  Petitioner's initial MRI in January of 2015 showed tendinosis and mild edema in the subdeltoid bursa.  Ex. 11 at 2.  Further, petitioner was noted as having full strength and range of motion in both shoulders for extensive periods of time.  See Ex. 2 at 1 (noting full range of motion and strength in both his shoulders on February 9, 2015); Ex. 12 at 6 (noting petitioner exhibited good range of motion on March 2, 2015).  However, both his strength and range of motion was noted as moderately reduced in June of 2018.  Ex. 27 at 23.

Petitioner's reporting of pain, while significant at first, also declined significantly with time.  Petitioner first reported pain of 8/10 on January 29, 2015.  Ex. 15 at 20.  Thereafter, he described his pain as moderate, dull, and "much less frequent" on March 1, 2016.  Ex. 18 at 1-3.  On August 18, 2016, petitioner again described his pain as less

frequent, stating his pain "may occur once a month." Ex. 23 at 4. Later, on June 4, 2018, petitioner reported his pain as 3 out of 10 in both shoulders. Ex. 26 at 1.[17]

Petitioner's treatments were also fairly conservative. Petitioner was first recommended to treat with only ice, Aleve, and, physical therapy. Ex. 12 at 5 (Dr. Moses recommending treatment was ice and Aleve on May 7, 2015). Later, petitioner attended 16 physical therapy sessions separated by three years, eight between January and March of 2015, and eight between June and July of 2018. Ex. 27 at 1-21.[18] Moreover, invasive therapies such as corticosteroid injections were not administered, and even declined on at least one occasion. See Ex. 2 at 1-2 (February 9, 2015 record indicating petitioner chose to hold off on a corticosteroid injection at that time); Ex. 26 at 3 (September 1, 2017 record stating "[w]e will consider a shot if it is not getting better over the next 3-6 weeks.").

Petitioner also did not seek treatment for significant periods of time, indicating his shoulder pain was not consistent or severe. For example, petitioner waited nearly three months after his vaccination to first seek treatment on January 14, 2015. Ex. 11 at 11.[19] Further, petitioner did not seek treatment for shoulder pain between May 7, 2015 and March 1, 2016, an eleven-month gap. See Ex. 12 at 5 (assessed with possible epicondylitis and left rotator cuff tendinitis on May 7, 2015) and Ex. 18 at 1-3 (reporting a history of shoulder pain to Dr. Levinson on March 1, 2016). Petitioner next reported pain over six months later, on August 18, 2016, again reporting pain was less frequent and "may occur once a month." Id. at 4. Petitioner next reported shoulder pain over a year later, when he sought care for right shoulder pain on September 1, 2017. Ex. 26 at 3. Following that, petitioner did not report shoulder pain until June 4, 2018, nine months later. Ex. 26 at 1.

As noted above, the undersigned has awarded compensation for pain and suffering above the median proffered SIRVA award in cases characterized either by a longer duration of injury or by the need for surgical repair. On the whole, the MRI imaging in these cases showed more significant findings. Further, petitioner did not require surgery and instead underwent a more conservative course of treatment. However, petitioner in this case suffered from bilateral shoulder pain to a varying degree for nearly four years.

---

[17] Petitioner did report a pain level of 10/10 in his right shoulder on September 1, 2017, however a lack of follow-up indicated his pain levels quickly receded. Ex. 26 at 3 (September 1, 2017 record stating "[w]e will consider a shot if [petitioner's pain] is not getting better over the next 3-6 weeks.").

[18] Petitioner asserts that he attended 24 physical therapy sessions, but the records show 6 of those were for unrelated lower back pain. Ex. 27 at 29-61.

[19] Petitioner states in his affidavit that he contacted his primary care physician in December of 2014 regarding pain following his flu vaccination, however there is no record of this communication. See Ex. 21 at 2.

####        i.        Comparison to Other SIRVA Awards

The facts in petitioner's case are most similar to those found in *Kim,* but the total length of time for his SIRVA, and his bilateral shoulder pain, are both significant differences.  The *Kim* petitioner did seek medical care sooner, 42 days after vaccination as opposed to almost three months in this case.  The undersigned finds that the petitioner in this case should be awarded more for his pain and suffering than the amount awarded in *Kim,* $75,000.00.

Petitioner's lengthy pain and suffering, but conservative course of treatment, is similar to *Bruegging* and *Dhanoa*, cases in which the undersigned awarded $85,000.00-$90,000.00.  In both of these cases, as well as the instant case, petitioner showed significant pain when initially treated.  Subsequently, petitioners underwent fairly conservative treatment: in *Bruegging*, petitioner pursued mainly physical therapy but also a cortisone injection; in *Dhanoa*, petitioner underwent two cortisone injections and an extended course of physical therapy.  Further, petitioners experienced pain for a significant period to time, 8-10 months in *Bruegging*,[20] and 11-36 months in *Dhanoa*.

Looking at the totality of circumstances, including the severity of petitioner's injury, the length of his treatment (including significant gaps), and the progression of his pain to encompass both shoulders, the undersigned finds $80,000.00 to be an appropriate amount for petitioner's past pain and suffering.

### D.  Past and Future Unreimbursable Expenses

Petitioner submitted documentation regarding $1,901.80 unreimbursed expenses as Ex. 28, with costs including mileage for his travel to and from medical visits, co-pays, over-the-counter medication (Aleve), and snow removal.  Pet. Br. at 12.  Respondent does not object to the $380.54 for mileage and co-pays but asserts the remaining $1,1521.26 for Aleve and snow removal is not sufficiently documented.  Resp. Br. at 9-10.

In support of petitioner's claim for over-the-counter medication and snow removal, petitioner was unable to submit actual receipts because he paid for those items in cash.  Pet. Br. at 12 n.4.  Petitioner submitted a price quote for a 220mg, 270 caplet bottle of Aleve caplets of $17.34, and asserted his expense include $17.34 per year since vaccination for Aleve, totaling $86.70.  Ex. 28 at 20.  Petitioner also asserts that prior to his vaccine-injury, he shoveled his driveway and front walk.  However, since his injury he has paid approximately $1,434.56 in cash for snow removal and submitted a snow removal cost and price report for his area that listed a variety of snow removal cost data for 2016.  Ex. 28 at 21.  It is petitioner's burden to adequately demonstrate

[20] However, the petitioner in *Bruegging* experienced pain at a level of eight to ten during the majority of this time.  *Id.* at *1-3.

15

entitlement to these amounts.  Without receipts, the amounts of these costs are not only speculative, but are unsupported by reliable documentation.

Petitioner also seeks $1,200.00 for future unreimbursed expenses related to his SIRVA, specifically a needle tenotomy or platelet-rich plasma injection that petitioner's expert, Dr. Bodor, described as "not covered by insurance but on the order of $1200". Pet. Br. at 13.  The procedure is one of several recommend by Dr. Bodor, that also included corticosteroid injections, subacromial decompression surgery, and physical therapy.  *Id.*  However, the procedure was not recommended by any of petitioner's treating physicians, and at this time it remains speculative what, if any, additional treatment petitioner requires.  Further, the actual amount this procedure may cost at the as-yet-unknown later date when petitioner may elect to have it performed is also speculative.

The undersigned has reviewed all of petitioner's submitted documents and concludes that petitioner is entitled to compensation for unreimbursable expenses in the amount of **$380.54**.  The undersigned is not persuaded by the remainder of petitioner's expense claims.

## V.      Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **the undersigned finds that $80,000.00 represents a fair and appropriate amount of compensation for petitioner's actual pain and suffering.[21] The undersigned also finds petitioner is entitled to $380.54 for past unreimbursed expenses.**

Based on the record as a whole and arguments of the parties, **the undersigned awards compensation in the amount of $80,380.54 representing $80,000.00 in compensation for actual pain and suffering and $380.54 in compensation for past unreimbursable expenses, in the form of a check payable to petitioner, Alceo Lucarelli.**

The clerk of the court is directed to enter judgment in accordance with this decision.[22]

---

[21] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required.  *See* § 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[22] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.

**IT IS SO ORDERED.**

<u>**/s/Nora Beth Dorsey**</u>
Nora Beth Dorsey
Chief Special Master